and you pay taxes on the interest and it compounds and at the end of the day you have a liquidated sum that's an after-tax sum and then you have to gross it up. That is exactly what we did. Every step of the way. Okay, well let me ask you this then. Do you have... And I can also tell you very quickly why it's exactly the same as the pre-tax number. And the very quick answer is principle times interest. You want to reduce it for taxes. You multiply it by 65%. So 0.65 times P times I is the after-tax amount. Grossing it up at the end is times 1 over 0.65. They cancel out. And if you're doing what you just described, you can work through the algebra, but in the end that's going to be the answer. It makes no difference whatsoever, which is why courts really don't want to get into it. Let me... Provided you gross it up at the end.  Provided you gross it up at the end. Absolutely. If you don't gross it up at the end, then... They pay taxes on money that they already ought to have been deemed to have paid their taxes on. But here's my problem. At A17,696, you have a calculation. A17,696. Now, I... This... Why don't I have it? Oh, 17... Sorry. And I... Maybe I found these charts to be a little difficult to work with, but I... This one is one that illustrates where I ran into a problem. Okay. Okay. Now, if you look at the... I'll orient myself just for a second. Okay. Go ahead. I'm with you. The first line, 3Q1998, go all the way over to taxable income, 30 million and change, and taxes paid. Yes. Right? Okay. So the taxes paid, 10 million, out of the 30 million. That's right. So what's left over ought to be around 20 million. That should... Sounds right to me. Right. And yet, we then go back to opening balance on the line that's marked 4Q1998, and instead of 20 million, we see 30 million. So it looks like the taxes have not been taken out of the balance. No, I think... What am I missing? I have to get my head into this, but I think that the hypothetical that's being worked on is that... This isn't really fair because we're basically into the arithmetic here. That's okay. I'm trying to... I think maybe the best... The hypothetical that was being worked upon is that we took the Supreme Court's guidance in DevEx, and we said, okay, let's assume that Austin owed us the money, and they didn't pay. What would we have done? What we would have done is we would have accrued as income the amount that was owed and paid taxes on it, even though it wasn't paid. Right, right. So that's where the taxes get paid. Right. And... You would have had 30 million in the first quarter. You had $30 million worth of taxable income. You know, I'm just not 100% sure what that means. Yeah. But basically, what we did is exactly what you described, and so the taxable income is the column four. The taxes paid is column five. You can see the taxes being taken out each year. Yeah, they're taken out, but then if you go back to the opening balance on the next column, it looks like the number from taxable income, not the number from taxable income minus taxes. That's my... I'm just not sure what's being done with the opening balance column. Okay. Let me propose the following. What I know that was done, though, for sure. Okay. All right. Well, it may be. It's what Your Honor said. What I'm going to... And furthermore, that that's why there's been no dispute. There's no dispute from anyone that the pre-tax amount is what the court imposed, and I don't think there's been a dispute from anyone that our computation, although I just heard it, I guess, from Mr. Demarest, but I don't see it in their papers, that our computation does exactly what you described. Okay. Well, I don't know if my questioning has been as focused, perhaps, as it needs to be in order to elicit what's troubling me, but I think it would be useful for the parties to submit a brief letter about this precise issue. Now, this precise issue is not in itself very precise, but I think you probably both understand what my concern is. If you can address the question of whether this calculation was done and demonstrate how it was done in a manner that reflects that the taxes were taken out of the balance at each quarter. Okay. I'm happy to do that. Rather than the balance accumulating on a non-tax basis. My guess is it's explained in here. It may well be, but I didn't find it. Because it wouldn't work otherwise. Or putting it differently, this formula that I just showed you is all that we're talking about. And just as a matter of just utterly simple algebra. Okay. If you gross it up, if the number... Let's start with what we all agree upon. We all agree that the after-tax number that we've computed is correct. The problem with your formula is that what we're doing is if you have multiple years, you're not grossing up until the end, right? I would rather... Here's where I'd make it different. The reason it's the same is because all you're doing is taking out taxes and you're using, in this hypothetical, we're using the same tax rate. That's key. So we're using the 35% tax rate always. That's what they proposed. We acquiesced in that. It becomes very muddy if you're using, as corporations often do, different tax rates in different years because... I understand. So long as all you're doing is using the same tax rate always, then if you pay taxes at the beginning and gross up at the end, you wind up with the same numbers if you didn't. If you have multiple years, I'm not completely convinced that's right because I think I would rather have... I think you're wrong. And you can demonstrate that. I'll be happy to. My guess is this declaration does it, but I will endeavor to make it even more clear. I will look forward to learning more. I will attempt to. All right. And what we should do, let's do this. Let's make it... We don't need a whole lot of extra paper on this. I think letters, no more than five pages, that will deal with this calculation issue would be very helpful within two weeks. Two weeks is fine. The only question we're addressing is whether our computation, in fact... Satisfies the formula, the description of the process. Okay. Does that encompass, Mr. DeMaris, the concept as you see it that you would like to address? Yes. Very good. That would be very helpful. Thank you. Thank you. Now, those are the three issues. And if you're finished, very good. Mr. DeMaris, we've gone over your time, but we'll give you a couple of minutes of rebuttal if you need it. Thank you, Your Honor. I'll be brief. First of all, going back to the validity issue, I think one of the things that we should stay focused on, and that was addressed by Mr. Diskin, is ERSEC versus the claim. And I'll just briefly state that Your Honor's question on ERSEC is on A18068. It says, this is reading from ERSEC, the edges may be cuffed if desired or simply smoothed to facilitate entry. Now, entry into what is the key point? What ERSEC is doing is going intra-luminal. It's going into the lumen. Mr. Diskin likes to call ERSEC a staple, but let me compare what these two products are because they do exactly the same thing. ERSEC is small, crimped down. It goes intra-luminal. It gets cuffed and smoothed, and it goes into the lumen, and then you expand it, at which point it goes into the internal walls of the lumen. That's how it works. He calls it stapling, but it's taking the lumen and a graft, going in between the two, and you expand it. What causes it to expand? Does a physician cause it? Yeah, there's a device. Here's the ERSEC sleeve. There's a device internal. You then stick it into the lumen, and you squeeze the device, and it expands the ERSEC. But presumably you've got two portions of the artery here that you've just cut. Yes, there's an artery and then the graft. All right, you put the graft in, and you stick ERSEC in all the way through the graft. To cover the joint. So you've got the lumen and the graft, and you're abutting them, and you're putting the ERSEC sleeve across the juncture and then expanding it so it's grabbing both sides and holding it together. Imagine a wire mesh. I've got the idea. That's exactly what a stent is. A stent is a wire mesh that's crimped down on a balloon. It goes into the affected area of the coronary artery. The bloom is expanded, and the stent embeds itself into the wall of the lumen. They're doing exactly the same thing. They are embedding themselves in the wall of the lumen. Why is that important? We only tried CLAIM-23. CLAIM-23 is not snaking it up through the groin, up through the artery, the method of implanting a stent. That's not what CLAIM-23 is. CLAIM-23 is an expanded intraluminal vascular graft that has a thin wall. It has a tubular member of a first diameter and a second. It has an expanded diameter, and then it gives you the architectural aspects of the device. And the only key issue that was tried at the first trial is ERSEC smooth or not. If ERSEC is smooth, everything else in CLAIM-23, which is an apparatus claim, was met. Their principal defense down below was ERSEC had bumps and ridges and therefore doesn't fit 23. It's what the Patent Office found when it rejected the claim. So when you look at what's going on here as far as what was tried below on the ERSEC issue, we need to stay focused on what the claim was. CLAIM-44 is the claim that Mr. Discant is talking about, a claim which would talk about how you go about the procedure of the Pomaz patent. But CLAIM-23 is the one we tried, and bumps and ridges were critical. And that's what they argued to the jury. On the stipulation point, Your Honor, if we look at, and this was your question, Judge Gaiar, so you asked about what about the stipulation makes it for the purposes of that trial. And if you go to the record and look at what was actually said to the court, the court says, and this is on A4821, the court says in line 3, trust me, it's not the same as giving one jury another jury's verdict on everything in the case. It is a finding of that other jury. She's essentially saying I'm going to tell this jury about the previous jury verdict on the Pomaz patent. And then we say, or Mr. Colbert from Boston Scientific says, Your Honor, if that is Your Honor's decision, then I would like to go back. I'd like to think a moment. But as I pointed out, we still think it's so inflammatory and prejudicial, we may be more inclined to accept the stipulation. We will treat the S-series stents as non-infringing rather than risk that prejudice. It's an offer that was made, and we may accept that to keep, and it goes on. He's talking temporally there. We accept it for this trial because you're going to instruct the jury on this fact. It's clearly temporal for that trial. That is not a stipulation that the AVE stents are non-infringing substitutes. It's, okay, if you're going to do that right now, I'm going to do this. They're not non-infringing substitutes. Yes, I can do that. But so clearly in context there, it was temporal for that purpose. And to get to Judge Gallarza's point about the Third Circuit law, the Williams v. Runyon case says quite clearly the court must explain on the record the reasoning behind its decision to reconsider a prior ruling. That did not happen in this case. And in the Waldorf case, one of the reasons for the Third Circuit law to get out of a stipulation is the occurrence of intervening events since the parties agreed to the stipulation. So under Third Circuit law, clearly we should be able to get out of the deal there. And then the last point on the interest, we'll address it in the letters, but Mr. Diskin's point about P times I is wrong on the math. If you're collecting interest on an after-tax principle, it is a very different number than collecting interest on the full principle. That's straight high school math, and we can explain it in the letters unless you want to talk about it now. I think that the letter will be more orderly, and we will be able to follow it better than trying to do this orally. Well, that concludes the hearing. We appreciate the argument, a very helpful argument, for both cases submitted. All rise. The Honorable Court is adjourned from day to day.